**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____ :
                                        :
GRACE PARK, individually and on behalf of all :
others similarly situated,              :
                                        :            Civil Action No: 1:16-cv-01520-LTS
                Plaintiffs,             :
                                        :
                vs.                     :            ORAL ARGUMENT REQUESTED
                                        :
FDM GROUP, INC.,                        :
                                        :
                Defendant.              :
                                        :
_____ :


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**RECONSIDERATION AND/OR RELIEF FROM JUDGMENT AND/OR LEAVE TO**
**FILE A SECOND AMENDED COMPLAINT**

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 3

I.      The Parties ........................................................................................................... 2

II.     Proceedings to Date ............................................................................................ 2

III.    Facts Pled in Plaintiff's First Amended Complaint ........................................... 3

      A.      Plaintiff Participated in the "FDM Academy"........................................ 3

      B.      All Trainees And Consultants Sign A Training Agreement and Employment
         Agreement Obligating Them To The Same Employment Related Penalties ......... 4

      C.      All Consultants Are Paid Similarly And Subject To The Same "No Overtime"
         Policy ...................................................................................................... 5

ARGUMENT ................................................................................................................. 6

I.      Standard of Review............................................................................................. 6

II.     The Court Should Reconsider Its Order Because The *Glatt* Factors Do Not Apply To
      Plaintiff's Minimum Wage Claims..................................................................... 8

      A.      Even If Plaintiff's Training Is Akin to an "Internship," Applying The *Glatt*
         Factors Is Inappropriate On A Motion To Dismiss ............................... 11

III.    Plaintiff Plausibly Alleged Facts Sufficient to Support Her Overtime Claims ............... 13

IV.     Plaintiff Plausibly Alleged That The Termination Fee Constituted an Illegal Kickback
      Under The FLSA.................................................................................................. 16

V.      The Court Committed Clear Error When It Denied Leave to Amend Particularly in View
      of the Extensive Factual Allegations of the Second Amended Complaint...................... 19

      A.      Plaintiff's Trainee Minimum Wage Claims (Counts 3 and 4) and Consultant
         Minimum Wage Claims (Counts 5 and 6) ........................................... 22

      B.      Plaintiff's Consultant Overtime Claims (Count 1and 2) ...................... 24

CONCLUSION................................................................................................................ 26

## TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Addison v. Reitman Blacktop, Inc.*,
   283 F.R.D. 74 (E.D.N.Y. 2011) ............................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...........................................12, 13, 14

*Bell Atlantic v. Twombly*,
   550 U.S. 554 (2007) ...........................................12, 13, 14

*Block v. First Blood Assoc.*,
   988 F.2d 344 (2d Cir. 1993) ..............................................21

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)..............................................12

*Chime v. Peak Sec. Plus, Inc.*,
   137 F. Supp. 3d 183 (E.D.N.Y. 2015) .................................10

*Dejesus v. HF Mgt. Services, LLC*,
   726 F.3d 85 (2d Cir. 2013) .......................................... passim

*Doe v. N.Y.C. Dep't of Social Services*,
   709 F.2d 782, 789 (2d Cir. 1983) ........................................7

*Dougherty v. North Hempstead Zoning Bd. of Zoning Appeals*,
   282 F.3d 83 (2nd Cir. 2002)..............................................21

*Farez- Espinoza v. Napolitano*,
   No. 08 Civ. 11060, 2009 WL 1118098 (S.D.N.Y. Apr. 27, 2009)...........................7

*Foman v. Davis*,
   371 U.S. 178 (1962)..............................................7, 19, 20

*Fowler v. Scores Holding Co., Inc.*,
   677 F.Supp.2d 673, 681 (S.D.N.Y. 2009) .............................9

*Gey Assocs. Gen. P'ship v. 310 Assocs.*,
   346 F.3d 31 (2d Cir. 2003)................................................6

*Glatt v. Fox Searchlight Pictures, Inc.*,
   811 F.3d 528 (2d Cir. 2016)................................8, 11, 12, 13

*Gordon v. City of Oakland*,
   627 F.3d 1092 (9th Cir. 2010) ....................................18, 19

iii

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
   No. 15 Civ. 4244, 2016 WL 6652733 (S.D.N.Y. Nov. 10, 2016) ...........................................7

*He v. Home on 8th Corp.*,
   No. 9 Civ. 5630, 2014 WL 3974670 (S.D.N.Y Aug. 13, 2014) ............................................16

*Heder v. City of Two Rivers*,
   295 F.3d 777 (7th Cir. 2002) .............................................................................................18

*Henderson v. Metropolitan Bank & Trust Co.*,
   502 F. Supp. 2d 372 (S.D.N.Y. 2007) ................................................................................7

*In re BDC 56 LLC*,
   330 F.3d 111(2d Cir. 2003) ................................................................................................6

*Javier v. Beck*,
   No. 13 Civ. 2926, 2014 WL 3058456 (S.D.N.Y. July 3, 2014) ...........................................10

*Ketner v. Branch Banking and Trust Co.*,
   143 F.Supp.3d 370 (M.D.N.C. 2015) ............................................................................18, 19

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
   274 F.3d 706 (2d Cir. 2001) ..............................................................................................10

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*,
   797 F.3d 160, 190 (2d Cir. 2015) .......................................................................................19

*Lundy v. Catholic Health Sys. of Long Island Inc.*,
   711 F.3d 106 (2d Cir. 2013) ...........................................................................................14, 15

*Mark v. Gawker Media LLC*,
   No. 13 Civ. 4347, 2016 WL 1271064 (S.D.N.Y. Mar. 29, 2016) .........................................12

*Marshall v. UBS Fin. Servs., Inc.*,
   No. 14 Civ. 4384, 2015 WL 4095232 (S.D.N.Y. July 7, 2015) ...................................8, 9, 12

*Milanese v. Rust-Oleum Corp.*,
   244 F.3d 104 (2d Cir. 2001) ..............................................................................................20

*Nakahata v. New York-Presbyterian Healthcare System, Inc.*,
   723 F.3d 192 (2d Cir. 2013) ......................................................................................14, 15, 20

*Nationwide Mut. Ins. Co. v. Darden*,
   503 U.S. 318 (1992) ............................................................................................................8

*Ocampo v. 455 Hospitality LLC*,
   No. 14 Civ. 9614, 2016 WL 4926204 (S.D.N.Y. 2016) ......................................................10

*Paganas v. Total Maint. Sol., LLC*,
   No. 15 Civ. 5424, 2016 WL 7048034 (E.D.N.Y. Dec. 5, 2016) ...........................................15

*Panther Partners Inc. v. Ikanos Communications, Inc.*,
   681 F.3d 114 (2d Cir. 2012)...................................................................................................21

*Pichardo v. Ashcroft*,
   374 F.3d 46 (2d Cir. 2004) .......................................................................................................7

*Rose v. Nw. Mut. Life Ins. Co.*,
   No. 14 Civ. 3569, 2016 WL 7188111 (E.D.N.Y. Dec. 12, 2016) .........................................12

*Rutherford Food Corp. v. McComb*,
   331 U.S. 722 (1947)...................................................................................................................8

*Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*,
   748 F.2d 774 (2d Cir. 1984).....................................................................................................21

*Scheuer v. Rhodes*,
   416 U.S. 232 (1974).................................................................................................................12

*Schwimmer v. Guardian Life Ins. Co.*,
   No. 93 Civ. 0428, 1996 WL 146004 (S.D.N.Y. Apr. 1, 1996)................................................21

*Sigala v. Spikouris*,
   345 Fed.Appx. 636 (2d Cir. 2009)............................................................................................7

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
   162 F.3d 724 (2d Cir. 1998) .................................................................................................6, 7

*Vernitron Corp. v CF 48 Associates*,
   478 N.Y.S.2d 933 (N.Y. App. Div. 1984) ..............................................................................24

*Warman v. Am. Nat'l Standards Inst.*,
   193 F.Supp.3d 318 (S.D.N.Y. 2016) .......................................................................................12

*Weg v. Macciarola*,
   729 F.Supp. 328 (S.D.N.Y. 1990) ...........................................................................................21

*Williams v. Citigroup Inc.*,
   659 F.3d 208 (2d Cir. 2011)........................................................................................7, 19, 20

*Zhong v. August Corp.*,
   498 F.Supp.2d 625 (S.D.N.Y. 2007) .........................................................................................8

**STATUTES**

Fed. R. Civ. P. 15(a)(2) ................................................................................................1, 7, 19

Fed. R. Civ. P. 59(e) ...........................................................................................................1, 7

Fed. R. Civ. P. 60(b)(1), (2), (6) ........................................................................................1, 7

29 C.F.R. § 531.34 ..........................................................................................................16, 18

29 C.F.R. § 531.35 ...............................................................................................................18

29 C.F.R. §785.27 ................................................................................................................10

29 U.S.C. § 203(e) .................................................................................................................8

29 U.S.C. § 203(d) .................................................................................................................9

29 U.S.C. § 203(g) .................................................................................................................9

## TREATISES

36 N.Y. Jur. 2d,
    Damages § 169 (West 2003) ......................................................................................24

Plaintiff Grace Park ("Plaintiff"), on behalf of herself and all others similarly situated, respectfully submits this memorandum of law in support of her motion (i) pursuant to Federal Rule of Civil Procedure ("FRCP") 59(e) and 60(b)(1), (2) and (6) as well as Southern District Local Rule 6.3[1] to reconsider, vacate, amend and/or otherwise obtain relief from the Order and Judgment (the "Order"), entered March 9, 2017, Dkt. No. 54-55, and (ii) pursuant to FRCP 15(a)(2), for leave to amend and file the proposed Second Amended Complaint ("SAC").[2]

## INTRODUCTION

Based upon a thorough review of this Court's Order, Plaintiff respectfully submits that the Court overlooked the factual allegations in Plaintiff's well-pled complaint, failed to construe the allegations in the light most favorable to the Plaintiff, and misapplied controlling precedent that would have caused the Court to change its decision.  As such, Plaintiff can demonstrate several instances of clear erroneous application of the applicable law and erroneous assessment of the factual allegations. Plaintiff can clearly meet the strict standards required to prevail on a motion for reconsideration and as set forth below, has satisfied this heavy burden. Alternatively, the Court should grant Plaintiff leave to amend her complaint in substantially the form attached hereto, as not doing so would result in a manifest injustice.

A close and careful review of the factual allegations in Plaintiff's First Amended Complaint ("FAC"), the Court's Order, and the legal grounds for moving for reconsideration make it self-evident that a substantial basis exists for granting such a motion.  First, the Court mistakenly relied on contractual language to determine employee-employer status as opposed to the appropriate "economic realities" test under the Fair Labor Standards Act.  Second, the Court

---

[1]    Plaintiff's motion is timely since it was filed "no later than 28 days after the entry of the judgment." *See* Fed. R. Civ. P. 59(e); *see also* Local Rule 6.3 (providing a carve out for the normal requirement that a motion for reconsideration be filed within 14 days for motions filed pursuant to Fed. R. 59).

[2]    A copy of the SAC is attached hereto as Ex. A (clean) and Ex. B (redline).

improperly applied a summary judgment standard at the motion to dismiss stage.  Third, the

Court mistakenly conflated the Termination Fee with a bona fide loan repayment, despite

Plaintiff's sufficiently alleged facts establishing the Termination Fee as an illegal kickback.

Fourth, the Court failed to make all inferences in the Plaintiff's favor, and thus dismissed her

well-pled, plausible claims. Finally, since the Court did not allow Plaintiff to move for leave to

replead her allegations, the Order resulted in a manifest injustice.  As such, Plaintiff respectfully

requests the Court grant her motion to reconsider the March 9, 2017 Order and Judgment, and/or

vacate and/or amend the Judgment to allow Plaintiff to amend her complaint.

## STATEMENT OF FACTS

### I.    The Parties

FDM Group Inc., is a Delaware corporation, registered to do business in New York, and

maintaining a corporate headquarters at 14 Wall Street, New York, NY 10005.  ¶ 6.[3]  Plaintiff

Park was a hired by FDM as Trainee from August 2014 through October 2014, during which

time she was engaged with FDM pursuant to a Training Agreement signed on or about her first

day of employment.  After completing her training, Plaintiff was placed with one of FDM's

clients and was then engaged with FDM pursuant to an Employment Agreement.  ¶ 5.  Thus,

Plaintiff Park was employed by Defendant from August 2014 through October 2015.

### II.    Proceedings To Date

On February 26, 2016, Plaintiff filed her Complaint in the United States District Court for

the Southern District of New York on behalf of herself and all other "similarly situated"

employees pursuant to Section 216 (b) of the Fair Labor Standards Act ("FLSA").  *See* Dkt. No.

1.  In her original Complaint and subsequent Amended Complaint (referred to herein as "FAC"),

---

[3]       Unless otherwise noted, references to "¶_" refer to Plaintiff's First Amended Complaint ("FAC"), filed on
June 17, 2016, Dkt. No. 20.

the Plaintiff alleges that Defendant willfully violated the FLSA when they failed to pay the minimum wage to Trainees and failed to pay overtime premiums to Consultants for the overtime hours worked.  ¶ 65.  She further alleges that FDM failed to pay the minimum wage under the FLSA and New York Labor Law ("NYLL"), and separately violated the NYLL law against unlawful deductions, when enforcing the Termination Fee set forth in the Training Agreement, Employment Agreement and FDM's US Staff Handbook (the "FDM Handbook").  ¶¶ 58-59.

On June 17, 2016, Plaintiff filed her FAC. Dkt. No. 20.  On the same date, Plaintiff filed a Motion for Conditional Certification and Court-Authorized Notice Pursuant to 29 U.S.C. § 216(b).  Dkt. No. 21.  On July 18, 2017, Defendant filed a Motion to Dismiss.  Dkt. No. 27. During the pendency of both motions, 10 opt-in plaintiffs contacted Class Counsel and joined the lawsuit by filing Consent to Join forms.  Dkt. Nos. 42-43, 45-48, 50-53.  On March 9, 2017, the Court granted Defendant's Motion to Dismiss and judgment was entered on the same day.  Dkt. No. 54 and 55.

III.    **Facts Pled In Plaintiff's First Amended Complaint**

A.      Plaintiff Participated In The "FDM Academy"

FDM's main business activities involve recruiting, training and placing their own permanent FDM Consultants with institutional clients across a range of technical and business disciplines.  ¶ 23.  Trainees who successfully satisfy the application process are hired by FDM and then placed in "FDM Academy" in New York City which lasts anywhere from two (2) to four (4) months (the "Training Period").  ¶¶ 23-25.

Plaintiff trained for two months and did not receive any compensation for her training.  ¶ 33.  Plaintiff's training, as well as training for those in her stream, consisted of classroom and practical skill development. ¶ 34.  Plaintiff and other trainees received training for approximately

8 hours per day, Monday through Friday, sometimes longer.  ¶ 36.  The specific and singular purpose of the training, regardless of stream, is to teach Trainees to perform the professional business and IT consultancy Defendant's clients desire, which is necessary for Defendants to generate billable revenue. ¶ 27.  The training enables Trainees to perform their job duties according to FDM's internal standards and the standards FDM's clients' desire.  ¶¶ 25-27.

Prior to September 2015, the Training Period was entirely unpaid, ¶¶ 29-30, and as such, all Trainees, despite attended trainings for 40 hours per week, were not compensated for such time.  ¶¶ 36-37.  After September 2015, FDM began paying Trainees the minimum wage for all hours worked during the Training Period. ¶ 29.

B.    All Trainees And Consultants Sign A Training Agreement And Employment
      Agreement Obligating Them To The Same Employment Related Penalties

On the first day of the Training Period, every Trainee is presented with a "Training Agreement" and told they must sign the Agreement and commit to a 2-year placement as an FDM Consultant or face financial penalties.  ¶¶ 24, 54.  Specifically, Trainees must pay a Termination Fee of $30,000 if the they leave FDM within their first year, and $20,000 if they leave FDM within their second year.  *Id*.  This obligation is reiterated in the FDM Handbook and the Employment Agreement provided upon placement.  *Id*.  According to FDM's website the Training Period "consists of foundation training followed by a specialized training stream, where trainees will learn the skills required to become an FDM Consultant."  *Id.* at ¶ 25.

FDM Consultants were required to "kickback" their earned compensation (both the basic pay and daily bonus components) in order to pay the Termination Fee in the event they resigned their employment before the end of their two-year commitment in order to repay training costs. ¶ 56.  As explained in Section 4.3 of the Employment Agreement, unless the FDM Consultant pays the fee by their last day of employment, FDM deducts from their final wages (basic pay, accrued

4

daily bonus compensation and holiday pay) in order to "partially settle liability."  ¶ 57.  If any balance remains following offset against compensation, FDM Consultants are then responsible for the payment of the balance of the Termination Fee by separate transaction.  *Id.*

Plaintiff resigned shortly before the start of her second year.  ¶¶ 5, 60.  FDM agreed to deem her resignation as having taken place in her second year for the sake of determining the amount of her Termination Fee, and she was allowed to pay a Termination Fee of $20,000 instead of $30,000.  ¶ 60.  Plaintiff paid the full Termination Fee shortly after resigning.  *Id.* Plaintiff is aware of at least two other FDM Consultants who have resigned and paid the Termination Fee.  ¶ 61.

> C.    All Consultants Are Paid Similarly And Subject To The Same "No Overtime" Policy

After completing the Training Period, Trainees apply for placement as Consultants with one of FDM's clients.  ¶¶ 21-22, 24, 31-32.  All Consultants are required to fulfill a two-year commitment with FDM's institutional clients (the "Placement Period"). ¶¶ 24, 55.  Only after completing the training period, and being placed at client for their two-year commitment at the end of training does an FDM Consultant begin to receive compensation in the form of basic pay and the daily bonus pay.  ¶¶ 29, 31.  During the Placement Period, regardless of job title or client location, Consultants are uniformly classified by FDM as exempt employees and paid on hybrid salary basis with daily performance bonuses. ¶¶ 47-51.

Despite routinely working over 40 hours per week, Consultants do not receive any overtime pay because FDM has a "no overtime, period" policy.  ¶ 42.  More specifically, the FDM Handbook states that, "unless FDM is able to agree [to] [SIC] an additional fee with the client [FDM Consultants] **will not receive any additional payments for hours worked beyond**

*the standard hours on any day*. . . this includes occasions where the client specifically requests that you remain at work later to carry out further work." *Id.*

According to the Handbook and Employment Agreement, all FDM Consultants were paid according to a hybrid compensation structure which included a low salary (known as "basic pay") and a daily performance bonus. ¶ 47.  Plaintiff was paid a daily bonus of $88.00 if she worked a full 8-hour day, and a half-day bonus of $44.00 if she worked at least four hours.  ¶ 47. If Plaintiff took vacation or sick days, she would not be paid her daily bonus.  *Id.*  The bonus was not paid in hourly increments, and no part of FDM Consultants' compensation was based on an hourly rate.  ¶ 49.  Plaintiff's regular schedule was for 40 hours a week.  ¶ 47.

Based on these uniformly applicable policies, Plaintiff and other Consultants often worked over 40 hours a week without overtime premium pay.  ¶ 43.  During her employment, Plaintiff complained to her FDM supervisor that she was regularly working over forty hours per week and inquired about receiving overtime pay.  ¶ 44.  Plaintiff was informed that unless her placement manager approved it, she was not eligible for overtime pay.  *Id.*  In February 2014, Plaintiff emailed her account manager Pippa Susskind to complain that she arrives at work by "8:30am" and gets out "around 6:45-7:15pm" four out of five days a week.  *Id.*  Plaintiff further stated that she "quite frequently" had to work on weekends and that she was not "able to even have a one hour lunch break (which [she was] not even paid for).  ¶ 45.

## ARGUMENT

### I.   Standard Of Review

A motion for reconsideration is appropriate to correct errors of law or fact.  *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 162 F.3d 724, 729 (2d Cir. 1998); *In re BDC 56 LLC*, 330 F.3d 111, 123 (2d Cir. 2003); *Gey Assocs. Gen. P'ship v. 310 Assocs.*, 346 F.3d 31, 34-

35 (2d Cir. 2003); *Henderson v. Metropolitan Bank & Trust Co.*, 502 F. Supp. 2d 372, 375-76 (S.D.N.Y. 2007).

"Reconsideration [under Rule 59(e)] is justified by, among other factors, "the need to correct a clear error or prevent manifest injustice."" *Henderson*, 502 F. Supp. 2d at 376 (citing *Doe v. N.Y.C. Dep't of Social Services*, 709 F.2d 782, 789 (2d Cir. 1983). Although the resolution of a motion for reconsideration is within the discretion of the court whose order is the subject of the motion, *Henderson*, 502 F. Supp. 2d at 376, "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Sigala v. Spikouris*, 345 Fed.Appx. 636, 637 (2d Cir. 2009) (citing *Transaero*, 162 F.3d 724 at 729). Under Rule 60(b), a court may vacate or modify an order for the following reasons: "mistake, inadvertence, surprise or excusable neglect; newly discovered evidence; fraud, misrepresentation or other misconduct; judgment is void; judgment is satisfied, released or discharged; ***or any other reason that justifies relief.***" *Farez- Espinoza v. Napolitano*, No. 08 Civ. 11060(HB), 2009 WL 1118098, at *3 (S.D.N.Y. Apr. 27, 2009). Indeed, Rule 60(b) has been described as "a grand reservoir of equitable power to do justice in a particular case." *Pichardo v. Ashcroft*, 374 F.3d 46, 55-56 (2d Cir. 2004).

Finally, Rule 15 permits a plaintiff to amend the pleadings with leave of the court or consent of the opposing party. Fed. R. Civ. Pr. 15(a)(2). Rule 15 instructs that leave to amend the complaint should be freely given "when justice so requires." *See id.*; *see also, e.g.*, *Williams v. Citigroup Inc.*, 659 F.3d 208, 212 (2d Cir. 2011). Where there is no actual or stated reason to deny leave, "such as undue delay, bad faith or dilatory motive … undue prejudice to the opposing party …, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also, e.g.*, *Gym Door Repairs,*

*Inc. v. Young Equip. Sales, Inc.*, No. 15 Civ. 4244(JGK), 2016 WL 6652733, at *3 (S.D.N.Y.

Nov. 10, 2016).

## II.   The Court Should Reconsider Its Order Because The *Glatt* Factors Do Not Apply To Plaintiff's Minimum Wage Claims

In dismissing Plaintiff's claim for minimum wage violations during her two-month

unpaid "training," the Court inappropriately applied the seven-factor summary judgment

standard articulated in *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528 (2d Cir. 2016).  In

applying this incorrect standard, the Court concluded that Plaintiff had not sufficiently alleged

her status as Defendant's employee during the Training Period, and on that basis dismissed

Plaintiff's claims.  Order at 4-7.  Respectfully, however, the Court's conflation of the standards

for an employee and the standards for "interns," as well as its reliance on the *Glatt* factors at the

motion to dismiss stage, was misplaced.  There is a crucial distinction between employees

entitled to compensation for unpaid training and "interns" or "trainees" entitled to wages for their

pre-hire internships.

Courts in the Second Circuit have repeatedly held that Plaintiff's burden to plead

"employee" status is minimal.  *See, e.g.*, *Dejesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 91 (2d

Cir. 2013); *Marshall v. UBS Fin. Servs., Inc.*, No. 14 Civ. 4384 (JGK), 2015 WL 4095232, at *3

(S.D.N.Y. July 7, 2015); *Zhong v. August Corp.,* 498 F.Supp.2d 625, 628 (S.D.N.Y. 2007).

Indeed, the FLSA's definition of employee status is striking in breadth and extends to many

atypical working relationships.  *See, e.g.*, *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318,

326, (1992); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729 (1947); *Dejesus*, 726 F.3d at

91.  The statute is written in the broadest possible terms, with an "employee" being "any

individual employed by an employer," 29 U.S.C. § 203(e)(1), while an "employer" encompasses

"any person acting directly or indirectly in the interest of an employer in relation to an employee." § 203(d). To "employ" is defined as "to suffer or permit to work." § 203(g).

In view of this expansive definition of "employee," courts in the Second Circuit have interpreted the plaintiff's burden to plead an employee-employer relationship to be extremely low. *See, e.g., Marshall*, 2015 WL 4095232, at *3; *Zhong,* 498 F.Supp.2d at 628. Indeed, at the motion to dismiss stage, courts have found that "complaints sufficiently allege employment when they state where the plaintiffs worked, outline their positions, and provide their dates of employment." *Dejesus*, 726 F.3d at 91. Because the employee-employer relationship is a fact-intensive inquiry, "on a motion to dismiss … the relevant inquiry is whether a defendant has been put 'on notice of the theory of employer liability.'" *Addison v. Reitman Blacktop, Inc.*, 283 F.R.D. 74, 84 (E.D.N.Y. 2011) (citing *Fowler v. Scores Holding Co., Inc.,* 677 F.Supp.2d 673, 681 (S.D.N.Y. 2009)).

As noted above, prior to her placement with one of Defendant's clients, but after her hire by Defendant, Plaintiff was required to undergo a full-time, two month "training period." ¶¶ 5, 23-27, 32, 36, 39. This training was a mandatory precursor to her placement with a client, and placement at the end of the training was understood to be a foregone conclusion. ¶¶ 16, 18, 22-25, 31-32. Trainees were only "enrolled" in the training after undergoing a typical application and interview process. ¶¶ 16, 19, 22-25, 27. This Training Period was conducted purely for the benefit of FDM, in that it allowed FDM to place trainees with their clients as part of their marketing strategy. ¶¶ 21, 27. Plaintiff was trained from 9 a.m. to 5 p.m. Monday through Friday for the entirety of her two-month "training period." ¶¶ 36-37. Plaintiff was not paid at all during the pendency of this mandatory training, during which she was instructed on how to become a marketable consultant on behalf of FDM in keeping with their business strategy and

practice.  ¶¶ 27, 29, 32-36.  Taking these allegations as true, Plaintiff has clearly alleged an employment relationship ***that began at the outset of the training period*** and not after its completion.

Nonetheless, the Court found that Plaintiff's allegations that the training was post-hire were not plausible because they are "inconsistent with the plain terms of the relevant documents."  Order at 7.  Instead of relying on Plaintiff's well-pled allegations about the economic reality, which support an inference that Defendant's exerted control over the Trainees sufficient to create an employer-employee relationship, the Court relied exclusively on the Training Agreement, which does not describe the relationship as one of "employment."  However, "[e]conomic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA."  *Ocampo v. 455 Hospitality LLC*, 2016 WL 4926204, at *7 (S.D.N.Y. 2016) (holding that despite express language in a franchise agreement to the contrary, an employment relationship is determined by the economic realities and not the contractual language).

In short, Plaintiff has alleged that she and her fellow "trainees" were employees entitled to compensation for training given to them as employees, and ***not*** merely interns entitled to wages.  Allegations of this kind must be evaluated by a four-factor test[4] outlined in the regulations promulgated pursuant to the FLSA.  *See* 29 C.F.R. § 785.27; *see also Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 721 (2d Cir. 2001) (applying four factor test to determine whether classroom attendance was compensable time for employees); *Chime v.*

---

[4]        "Pursuant to regulations promulgated under the FLSA, the time that an employee spends at "lectures, meetings, training programs and similar activities" need not be counted toward that employee's hours worked where:
        [1.] Attendance is outside of the employee's regular working hours;
        [2.] Attendance is in fact voluntary;
        [3.] The course, lecture, or meeting is not directly related to the employee's job; and
        [4.] The employee does not perform any productive work during such attendance."
*Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 720-21 (2d Cir. 2001).

*Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 194 (E.D.N.Y. 2015) (same); and *Javier v. Beck*, No.

13 Civ. 2926, 2014 WL 3058456, at *3 (S.D.N.Y. July 3, 2014) (same).  Whether Plaintiff and

the putative collective were employees entitled to compensation is a crucial factual issue, yet the

Court summarily found that Plaintiff underwent training "pre-hire" – despite Plaintiff's

allegations directly to the contrary.  *Compare* ¶¶ 22-24, 38 *and* Pl.'s Opp. at 5-7 *with* Order at 4.

The Court did not take Plaintiff's allegations as true or make all reasonable inferences in

Plaintiff's favor.  Indeed, the Court does not even discuss its reasoning in choosing to apply the

*Glatt* test proposed by Defendant instead of the four-factor test Plaintiff argued is appropriate.

*See* Order at 4.  Instead, the Court makes the inappropriate factual finding that Plaintiff's training

was akin to a "pre-hire" internship and therefore subject to *Glatt*, ignoring the fact that the *Glatt*

Court specifically notes that its holding does not apply to training programs outside the "modern

internship" context.  *Glatt*, 811 F.3d at 537 (stating that "[t]he approach we adopt … is confined

to internships and does not apply to training programs in other contexts").

A.     Even If Plaintiff's Training Is Akin To An "Internship," Applying The *Glatt*
       Factors Is Inappropriate On A Motion To Dismiss[5]

In its Order, the Court carefully applies the factors laid out in *Glatt*, yet neglects to note

that *Glatt* – like *Kosakow* – applies at the summary judgment stage, ***not*** the motion to dismiss

stage.  Indeed, the *Glatt* test is comprised of no less than seven discrete and "highly fact-

specific" factors that require evaluation of the "totality of the circumstances" in order to

determine the extent of the employee-employer relationship.  *Id.* at 535-536.  While this test may

be appropriate at the summary judgement stage, Plaintiff respectfully submits that it is

impermissible to demand that she meet this burden ***at the pleading stage***, as the Court did in its

---

[5]     Even if Court finds upon reconsideration that the *Glatt* factors do apply at this stage in the proceedings,
Plaintiff does not concede that the Court has applied them correctly to the allegations in this case.

Order.  Order at 4-5.  Indeed, the application of *Glatt* at the motion to dismiss stage completely undermines the requirement that in deciding a motion under Rule 12(b)(6) a court must "construe[] the complaint liberally, 'accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.'" *Zhong*, 498 F. Supp. at 628 (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  Indeed, "intern" or "unpaid training" cases in this Circuit have been permitted to proceed beyond the motion to dismiss stage for this very reason.  *Compare Marshall*, 2015 WL 4095232, at *3 (S.D.N.Y. July 7, 2015) (denying defendants' FRCP 12(b)(6) motion in intern case); *with Rose v. Nw. Mut. Life Ins. Co.*, No. 14 Civ. 3569(JFB)(AYS), 2016 WL 7188111 (E.D.N.Y. Dec. 12, 2016) (applying the *Glatt* factors at **summary judgment**) and *Mark v. Gawker Media LLC*, No. 13 Civ. 4347(AJN), 2016 WL 1271064, at *7 (S.D.N.Y. Mar. 29, 2016) (applying *Glatt* at **summary judgment**); *see also Warman v. Am. Nat'l Standards Inst.*, 193 F.Supp.3d 318, 325 (S.D.N.Y. 2016) (stating that the issue of whether plaintiffs were employees or trainees under the FLSA would "come into play at the merits stage").

Respectfully, Plaintiff submits that applying these factors on a motion to dismiss critically undermines the "plausibility" standard as articulated in *Bell Atlantic v. Twombly*, 550 U.S. 554 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  *See id.* at 678 (quoting *Twombly* and holding that "to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is **plausible** on its face.'") (emphasis added).  Indeed, "a well- pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable." *Twombly*, 550 U.S. at 556.  This is because, at the motion to dismiss stage, "'the issue is not whether a plaintiff will ultimately prevail but whether

the claimant is entitled to offer evidence to support the claims.'"  *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

By alleging where she worked, her position and her dates of employment, Plaintiff here easily meets the pleading requirement necessary at this stage.  *See Dejesus*, 726 F.3d at 90-91 (noting that the district court had too strictly applied the "employee" pleading standard and reiterating the broad pleading standard for employee status).  Furthermore, Plaintiff clearly put Defendant on notice of her theory of liability for the unpaid training – that Plaintiff and the other "trainees" were not simply unpaid "trainees" but rather employees covered by the FLSA's minimum wage protections.  ¶¶ 16, 18-19, 22-25, 27.  Indeed, this theory was undoubtedly apparent to Defendant, and they moved to dismiss using case law on unpaid training and internships.  *See* Def.'s Motion to Dismiss at 9-11, Dkt. No. 28 (discussing *Glatt* at length and urging the Court to apply that standard).  Crucially, however, the Second Circuit case law on unpaid training and internships, such as *Glatt* and *Mark*, does not create or apply standards appropriate at the motion to dismiss stage.  Instead, by its very terms as a fact-intensive inquiry requiring the court to drill down on specific elements of an employment relationship, *Glatt* provides the standard to be applied at summary judgment.

Plaintiff submits that relying upon *Glatt* factors on a motion to dismiss and dismissing Plaintiff's claims has resulted in manifest injustice to Plaintiff and the putative collective she represents who seek to recoup the wages they were unlawfully denied as a result of Defendant's practices.  Respectfully, the Order defies Second Circuit and Supreme Court precedent, and therefore the Court should reconsider and/or vacate its decision denying these claims.

III.    <u>**Plaintiff Plausibly Alleged Facts Sufficient To Support Her Overtime Claims**</u>

To survive a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted

as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A plaintiff has alleged with "facial plausibility" the factual allegations in the complaint "allow[] the court to draw the reasonable inferences that the defendant is liable for the misconduct alleged."  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 556).  Plaintiff's factual allegations must be more than "merely consistent with" liability to cross the threshold between "possibility" and "plausibility."  *Id.* (quoting *Twombly*, 550 U.S. at 557).  However, "plausibility" at the pleading stage is less exacting than "probability" and requires only that plaintiff provide enough facts to permit the reasonable expectation that discovery will reveal evidence probative of the defendant's liability.  *Twombly*, 550 U.S. at 556 (the law "does not impose a probability requirement at the pleading stage.").  Indeed, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely."  *Id*. (quotation marks and citation omitted).

The Court correctly relies upon a trio[6] of Second Circuit cases that articulate the pleading standard for FLSA overtime claims.  *See* Order at 10-11 (citing *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106 (2d Cir. 2013), *Nakahata v. New York-Presbyterian Healthcare System, Inc.*, 723 F.3d 192 (2d Cir. 2013) and *Dejesus v. HF Mgt. Services, LLC*, 726 F.3d 85 (2d Cir. 2013)).  These cases make clear that a plaintiff must – in accordance with the pleading standard set out in *Iqbal* and *Twombly* – allege facts sufficient to allow the court to make a reasonable inference that she is entitled to overtime.  *See Nakahata*, 723 F.3d at 201.  In practice, this means a plaintiff must provide detail "about the length and frequency of their unpaid work."

---

[6]     Notably, the complaint in these three actions were nearly identical and relied almost entirely on boilerplate allegations.  The plaintiffs in all three actions were represented by the same law firm, and the courts hearing these cases made clear their suspicion that counsel for plaintiffs were "fishing" for a set of defendants that could be liable, as well as their concern that the firm may not have been acting in the plaintiffs' best interests. *See Dejesus*, 726 F.3d at 85, 90.

*Id.*; *Lundy*, 711 F.3d at 114 (holding that "a plaintiff must sufficiently allege 40 hours of work in a given workweek as well as some uncompensated time in excess of the 40 hours"). However, a plaintiff does not need to include an approximation of overtime hours worked, keep her own records or plead with mathematical certainty the overtime she is owed. *Nakahata*, 723 F.3d at n. 10; *Dejesus*, 726 F.3d at 90; *see also, e.g.*, *Paganas v. Total Maint. Sol., LLC*, 15 Civ. 5424, 2016 WL 7048034, at *9 (E.D.N.Y. Dec. 5, 2016) (distinguishing the *Lundy* trilogy and stating that "[t]o meet the pleading standard, it is sufficient for a plaintiff to allege a pattern of overtime work instead of providing the specific hours worked").

Taking her allegations as true and making all inferences in her favor, Plaintiff's FAC met the pleading standard provided by *Lundy* and progeny. Plaintiff alleges that she worked for Defendant as a consultant from October 2014 through October 2015. ¶¶ 5, 60. Her standard schedule provided that she worked 40 hours per week. ¶ 42. Not only does she allege that she "regularly" worked over 40 hours per week, she also alleges that Defendant had a policy against paying overtime for any reason. ¶¶ 42, 43-44. Furthermore, in an email to her supervisor dated February 7, 2015, Plaintiff complained that "since December [2014]" she has arrived to work from 8:30 through 6:45 or 7:15 p.m "4 out of 5 days a week." ¶ 45; Dkt. No. 21-11. In that same email, Plaintiff further stated that she only takes her one-hour unpaid lunch "maybe twice a week", "occasionally" must work when she gets home from work, and "quite frequently" works on weekends. *Id.* Thus, even assuming that Plaintiff **did not work at all one day per week**, basic arithmetic leads to the conclusion that for at least nine weeks, Plaintiff worked **at the very least,** three hours of overtime per week. This stands in stark contrast with the plaintiffs in *Lundy*, whose claims "failed because of arithmetic: tallying the plausible factual allegations, [the court] could not get beyond forty hours in any given week[.]" *See Dejesus*, 726 F.3d at 89 (discussing

*Lundy*).  Here, even ignoring the requirement to make all inferences in the plaintiff's favor, Plaintiff has plausibly alleged overtime violations under the FLSA.

**IV.**     **Plaintiff Plausibly Alleged That The Termination Fee Constituted An Illegal Kickback Under The FLSA**

In support of her consultant minimum wage claim, Plaintiff is simply required to allege facts sufficient to support an inference that (i) the Termination Fee constituted an illegal "kickback" under the FLSA, and (ii) payment of such caused her to be paid less than the minimum wage for all hours worked.  In its decision, the Court correctly set forth the legal standard for determining when a required payment will be considered a "kickback" in violation of the FLSA and its regulations.  *See* Order at 8 (citing 29 C.F.R. § 531.34); *see also He v. Home on 8th Corp.*, No. 09 Civ. 5630, 2014 WL 3974670, at *9 (S.D.N.Y Aug. 13, 2014) (defining an illegal "kickback" as any deduction made "by separate transaction for costs that are specific business expenses of the employer, and that are primarily for the benefit of the employer").  Respectfully, however, the Court's factual determination that the Termination Fee was not an "illegal kickback" flows directly from errors in construing the facts alleged and in applying the law, and as such, should be reconsidered and/or vacated.

To meet her burden at this stage, Plaintiff was required to plead that the Termination Fee represented a specific business expenses that was primarily for Defendant's benefit.  The FAC contains allegations that the "specific and singular purpose of the training" was to teach Plaintiff to perform her professional business and IT consultancy job ***for Defendant's clients***, which was necessary for Defendant in order to generate billable revenue in keeping with its marketing strategy and practice.  ¶ 27.  Furthermore, by Defendant's own admission this "kickback" was designed to reimburse Defendant for the costs of training – a clear benefit for the employer.  ¶¶ 54-55.  These allegations sufficiently support an inference, when construed in the light most

favorable to the Plaintiff, that the Termination Fee was in fact a business expense primarily for Defendant's benefit and thus an illegal kickback.

Despite these allegations, the Court's Order found that the Termination Fee was not a kickback because "repayment of the costs of a training program have been upheld as akin to loan repayment provisions." Order at 9. In reaching this conclusion, the Court (i) improperly made factual findings, and (ii) misinterpreted and misapplied the relevant case law. *Id.* As such, Plaintiff respectfully requests that the Court reconsider its Order.

In its Order, the Court found that the Termination Fee constitutes a loan representing the cost of the training simply because Defendant's Employment Agreement describes it as such, despite Plaintiff's plausible allegations to the contrary. Order at 8-9; ¶¶ 55-61. Indeed, Court's finding that the $20,000 kickback was merely reimbursement for the costs of training is unsupported by the Training and Employment Agreements themselves. Despite variations in the length of trainings based on stream and/or early placement, Defendant did not calculate the Termination Fee based on the actual costs of the courses and modules started and/or completed. *Compare* Dkt. No. 29-1 at 10-11 *with* Dkt. No. 29-2 at § 1. In fact, Plaintiff's training stream – Data Analysis – only required 240 hours of training at $75 per hour, or a total cost of $18,000. *See* ¶ 22; *see also* Dkt. No. 29-1 at 10-11. Despite this, Plaintiff's Employment Agreement set her Termination Fee at $30,000 in the first year and $20,000 in the second year. *See* Dkt. No. 29-2 at § 1. Plaintiff paid the $20,000 Termination Fee – more than the stated cost of her curriculum – even after completing a year of service. ¶ 60.

In reaching its conclusion, the Court ignored Plaintiff's well-pled allegations that the training costs represented a business expense primarily for Defendant's benefit. Plaintiff alleges that the cost incurred by Defendant for the training was solely for the purpose of generating

17

FDM's only source of revenue and key to its marketing strategy: hourly billables from consultant placements.  As such, the Court's factual finding that does not take Plaintiff's allegations as true is clearly inappropriate at the 12(b)(6) stage.  Even assuming such a conclusion could be drawn on a motion to dismiss, where all inferences are to be made in favor of the plaintiff and factual issues are not to be resolved, nothing in Plaintiff's complaint or any documents referred to therein could support such a conclusion.

Moreover, the Court's reliance on *Heder v. City of Two Rivers,* 295 F.3d 777 (7th Cir.2002), and *Gordon v. City of Oakland,* 627 F.3d 1092 (9th Cir. 2010) to support its findings was misplaced.  In *Ketner v. Branch Banking and Trust Co.*, 143 F.Supp.3d 370, 383–84 (M.D.N.C. 2015), a case factually identical to Plaintiff's, the court provided a detailed analysis as to why *Heder* and *Gordon* are inapplicable to the FLSA's illegal kickback rule.  Specifically, *Ketner* distinguished the two cases noting that,

> *Heder* was on appeal after the district court's entry of partial summary judgment and did not address whether out-of-pocket reimbursements, such as the termination fee, constituted kick-backs under 29 C.F.R. § 531.35.  Rather, *Heder* dealt with whether an agreement that required firefighters to reimburse the city for their paramedic training if they failed to remain employed with the city for the required length of time was valid and enforceable under [a] Wisconsin law [regarding restrictive covenants and that i]n turn, *Gordon's* reliance on *Heder* for the proposition that a police training agreement was not a kick-back under 29 C.F.R. § 531.35 is similarly misplaced.

*Ketner*, 143 F.Supp.3d at 383–84.

Similar to *Ketner*, and unlike *Heder* and *Gordon* where the plaintiffs received a certification recognized beyond their former employers, here Plaintiff alleged that Defendant's training program, according to FDM's own website, merely taught skills "required to become an FDM Consultant."  ¶ 25.  Further, the costs of the training program here are significantly higher

18

– nearly a year's base salary – than those in *Heder* and *Gordon*.  *See Ketner*, 143 F.Supp.3d at

384 (noting that the cost of the training was the same as an entire year salary); *Heder,* 295 F.3d

at 782 (full cost of tuition and books came to approximately $1,400); *Gordon,* 627 F.3d at 1093

(full cost of training was $8,000).  Furthermore, Defendant did not adjust the Termination Fee

despite some training and/or employment periods lasting longer than others.  *See id.*  The facts

alleged in the FAC and permissible extrinsic evidence demand a finding that Plaintiff alleged a

plausible claim that the $20,000 she paid FDM constitutes a kickback of her salary in violation

of the FLSA's minimum wage requirement.  Moreover, "[u]ltimately, factual development of

this case will determine whether the costs of training … is a bona fide loan as asserted by

[Defendant] or a kick-back of salary as alleged by [Plaintiff]."  *Ketner*, 143 F.Supp.3d at 384.

**V.** **The Court Committed Clear Error When It Denied Leave To Amend Particularly In View Of The Extensive Factual Allegations Of The Second Amended Complaint**

In the event that the Court declines to reconsider its prior Order, Plaintiff respectfully

requests that the Order and Judgment be vacated and/or amended to permit Plaintiff to file a

Second Amended Complaint ("SAC").  The SAC[7] contains significant additional factual

allegations that fully address and respond to the deficiencies identified in the Court's Order, and

as such, Plaintiff should be permitted to file the SAC in light of Rule 15's permissive provision

that courts should "freely give leave" to amend a complaint "when justice so requires."  Fed. R.

Civ. Pr. 15(a)(2); *Foman*, 371 U.S. at 182 ("If the underlying facts or circumstances relied upon

by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his

---

[7]       Since Local Rule 6.3 prohibits the filing of affidavits in support of motions for reconsideration or reargument absent court order, we instead submit the proposed Second Amended Complaint for the Court's review as an attachment hereto.  *See Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (leaving it to the district court to decide whether to allow a declaration with factual allegations underlying any proposed amendments or "a proposed amended pleading in some other form.").

claim on the merits."); *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2d Cir. 2015); *Williams v. Citigroup Inc.*, 659 F.3d 208, 212 (2d Cir. 2011).

Where, as here, a party seeks to file an amended complaint after judgment is entered, the court must balance Rule 15's liberal policy to "freely give leave" to amend when "justice so requires" with the courts' emphasis on the "value of finality." *See Williams*, 659 F.3d at 212-14. However, "considerations of finality do not always foreclose the possibility of amendment, even when leave to replead is not sought until after the entry of judgment." *Id.* at 213; *see also Foman*, 371 U.S. at 179 (permitting amendment where plaintiff sought leave to amend after judgment had been entered). In balancing these factors in the instant matter it is clear that the liberal and remedial purpose of Rule 15 outweighs the Court's interest in finality. To date, the parties have yet to engage in any discovery on this matter. *See* Dkt. No. 6 (staying discovery pending resolution of dispositive motions). Plaintiff, however, can sufficiently allege facts that will clearly entitle her to present evidence of her claims. *See generally* SAC.

Furthermore, "absent an opportunity to seek leave to amend, [p]laintiffs cannot be held accountable for failing to make the necessary motion" to seek such leave. *Nakahata v. New York-Presbyterian Healthcare System, Inc.*, 723 F.3d 192, 199 (2d Cir. 2013) (finding an abuse of discretion where district court failed to give plaintiff an opportunity to amend by entering judgment on the same day as the order was issued). Similarly, Plaintiff was not afforded any opportunity to seek leave to amend in this matter. *See* Dkt. No. 54 (Order granting Defendant's Motion to Dismiss and requesting the Clerk of Court enter judgment and close the case); *see also* Dkt. No. 55 (Clerk's Judgment closing the case, entered approximately thirty (30) minutes after the Court's Order). As such, Plaintiff had no opportunity to review the Court's ruling and the pleadings in order to address the Court's findings and the purported deficiencies in her FAC.

20

Additionally, the proposed amendments must be allowed because they are not futile and there is no prejudice or bad faith. *See Foman*, 371 U.S. at 182; *see also Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). An amendment to a pleading will only be deemed futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). *See Dougherty v. North Hempstead Zoning Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2nd Cir. 2002). If, however, there are at least colorable grounds for relief, justice requires that the motion to amend be granted. *See Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 783 (2d Cir. 1984); *Schwimmer v. Guardian Life Ins. Co.*, No. 93 Civ. 0428, 1996 WL 146004, at *3 (S.D.N.Y. Apr. 1, 1996) (allowing amendment where "it is not so frivolous or outlandish to render it futile"), *aff'd*, 104 F.3d 354 (2d Cir. 1996); *Weg v. Macciarola*, 729 F.Supp. 328, 341 (S.D.N.Y. 1990) (same).

"In assessing whether the proposed complaint states a claim" for the purpose of determining whether amendment would be futile, a court will consider "the proposed amendment[s] . . . along with the remainder of the complaint, . . . accept as true all nonconclusory factual allegations therein, and draw all reasonable inferences in plaintiff's favor to determine whether the allegations plausibly give rise to an entitlement to relief." *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114, 119 (2d Cir. 2012) (citations omitted). "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *Block v. First Blood Associate*s, 988 F.2d 344, 350 (2d Cir. 1993). Even significant amounts of "time, effort and money . . . expended in litigating [a] matter" cannot establish the "substantial prejudice" that the nonmovant must show to preclude leave to amend. *Id.* at 351.

In painstaking detail, the SAC recites facts, when viewed in the light most favorable to the Plaintiff, plausibly give rise to an entitlement to relief on each of Plaintiff's claims.

A.   Plaintiff's Trainee Minimum Wage Claims (Counts 3 and 4) And Consultant Minimum Wage Claims (Counts 5 and 6)

To bolster her claim that the training period was post-hire and that an employer-employer relationship existed during the training period Plaintiff has included, *inter alia*, the following additional allegations:

- Plaintiff applied for both the training and consultant position at FDM through a third-party website, went through two rounds of interviewing with FDM representatives, and authorized FDM to run a background check.  SAC ¶¶ 21-25.

- After Plaintiff had completed each of these steps, FDM informed her that she had been selected for a position and hired by FDM.  *Id.* at ¶ 26.

- Trainees could not choose to be placed with FDM clients without completing their training; however, FDM could choose to place Trainees prior to their completion of the training.  *Id.* at ¶ 32.

- Participation in the training was a pre-condition for placement on a client site.  *Id.* at ¶ 27.

- According to FDM's Code of Conduct, Plaintiffs and all other Trainees are required to, among other things, to abide by FDM's rules and regulations, dress professionally, read and respond to emails regularly; attend training full-time; and provide a doctor's note if absent for longer than 7 days.  *Id.* at ¶ 34.

- Immediately upon hiring the Trainees, FDM begins marketing Trainee resumes to FDM's clients and if a Trainee is selected for placement prior to completing their training they are immediately placed.  *Id.* at ¶¶ 36-38, 42-43, 45.

- The $30,000 Termination Fee applies regardless of whether Trainees complete the training or not.  *Id.* at ¶ 39.

- FDM had the power to hire and fire Trainees at any time.  A Trainee could not simply enroll in "FDM Academy."  Instead, they were vetted by a typical interview process, similar to any other comparable employment position.  *Id.* at ¶ 55.

22

- FDM could discontinue a Trainees training at any time if the Trainee's performance was unsatisfactory.  *Id.* at ¶ 56.

- Trainees were contractually obligated to complete their training and accept a placement with an FDM client upon completion of their training or upon FDM's request.  *Id.* at ¶ 58.

- FDM supervised and controlled the Trainees' work schedules as well as the conditions of their employment, including determining the payment Trainees received (i.e., no payment at all).  *Id.* at ¶ 59.

- Upon information and belief, FDM maintained records of all Trainees, including attendance and performance. *Id.* at ¶ 60.

- Plaintiffs also used FDM's premises and equipment and during the training period worked exclusively or predominately for FDM because the training was Monday through Friday from approximately 9am to 5 pm, leaving little time or possibility for employment elsewhere.  *Id.* at ¶ 61.

- Indeed, Plaintiffs regarded the commencement of their training as the beginning of their employment with FDM, and they signed agreements committing them to continued employment with FDM after their training ended.  *Id.* at ¶ 62.

To bolster her claim that the Termination Fee was an illegal "kickback" Plaintiff has included, *inter alia*, the following additional allegations:

- "FDM Academy" functions as a marketing tool for FDM, in which Trainees are instructed in how to become FDM-approved consultants and FDM can in turn market their consultants to clients.  *Id.* at ¶¶ 36-38, 42-43, 45.

- The costs associated with the training are a business expense that Defendant incurs in order to provide and maintain a "pool" of Consultants for FDM's clients to choose from and to ensure that FDM's clients are satisfied with the services provided such that they continue to pay to utilize FDM's consultancy services.  *Id.* at ¶ 46.

- Plaintiff did not benefit from her participation in FDM's training program and it did not provide her with any significant benefits that are recognized within the broader marketplace beyond what any other normal job experience might provide; specifically, her current employer does not recognize the training she received at FDM as distinguishing her in any meaningful way from other candidates.  *Id.* at ¶¶ 47-50.

- Upon information and belief, FDM's training program is a crucial element of its business model because it allows FDM to market its consultants at a higher rate based on "training." *Id.* at ¶ 51.

To bolster her claim that the Termination Fee was not akin to a loan representing the

actual cost of the training Plaintiff has included, *inter alia*, the following additional allegations:

- According to the FDM Academy Course Description, appended to the Training Agreement, the cost of each training course is set at $75 per hour for each module started, up to a maximum of $30,000.  The Java Training and the Dot Net Training totaled 680 hours, or $51,000; the Application Support Training and PMO Training totaled 400 hours, or $30,000; and the Financial Data Analysis Training totaled 240 hours, or $18,000. *Id.* at ¶ 116.

- Plaintiff was in the Data Analysis stream and thus the actual cost of her training, pursuant to FDM's Course Description, was only $18,000. *Id.* at ¶ 119.

- Pursuant to FDM's Course Description, the cost of training was $75 per hour for any module that was started, regardless of whether it was actually completed. *Id.* at ¶ 120.

- Upon information and belief, Class and Collective Class Members who received a placement before completing their training were assessed the full $30,000 Termination Fee, irrespective of the actual cost of the training. *Id.* at ¶¶ 115, 117.

- The Termination Fee did not fix an amount bearing a reasonable relationship to the anticipated loss suffered by FDM; in fact, according to the terms of the Training Agreement, the first year penalty could be assessed at any point during a Consultant's first year in the event of early departure, and the second year penalty could be assessed at any point during the second year, meaning that the purported productivity-related gain offset against the specific first and second year penalties was widely variable while the penalty remained fixed.[9] *Id.* at ¶ 125.

B.    Plaintiff's Consultant Overtime Claims (Count 1 and 2)

To bolster her claim that the Termination Fee was not akin to a loan representing the

---

[9]    Contrary to the Court's assertion, the Termination Fee would be considered a liquidated penalty under New York law given these facts, and because (i) fee shifting and interest are chargeable to the breaching party; and (ii) actual damages are readily capable of calculation. *See Vernitron Corp. v. CF 48 Associates*, 478 N.Y.S.2d 933, 934 (N.Y. App. Div. 1984); 36 N.Y. Jur. 2d, Damages § 169 (West 2003).

actual cost of the training Plaintiff has included, *inter alia*, the following additional allegations:

- Plaintiff's regular schedule was Monday through Friday, 9am to 6pm with a 1-hour unpaid lunch break, totaling 40 hours a week, which she regularly worked – at a minimum.  *Id.* at ¶¶ 87-88.

- Plaintiff's regular schedule was confirmed in a "Mountie Schedule", "a reference document" including "minimum hours per day [and] days per week" of 8 hours per day and 5 days per week – which Plaintiff regularly worked.  The Mountie Schedule was emailed to Plaintiff by Shaundrea Snell, FDM's Financial Account Manager, on or about October 1, 2015.  *Id.* at ¶¶ 89-91.

- The Mountie Schedule further stated, "[u]nless FDM is able to agree [to] an additional fee with the client you will not receive any additional payments for hours worked beyond the standard hours on any day. This includes occasions where the client specifically requests that you remain at work later to carry out further work."  *Id.* at ¶ 92.

- The same policy in the Mountie Schedule is outlined in the FDM Staff Handbook and both policies commit FDM to a refusal to pay overtime for hours worked over 40.  *Id.* at ¶¶ 93-94.

- The email with the Mountie Schedule attached was sent to Plaintiff nearly 8 months after she had complained to her Account Manager, Pippa Susskind about working overtime beginning on or about December 2014.  *Id.* at ¶ 95.

- Specifically, on or about December 2014 Plaintiff began working approximately 10 to 20 hours of overtime a week.  This continued for most weeks until she left FDM's employ on or around October 2015.[10]

- While at work, from 8:30 a.m. until 6:45-7:15 p.m. Monday through Thursday and from 8:30 a.m. until 5 p.m. on Fridays, Plaintiff Park was working the entire time.  *Id.* at ¶ 104.

- Nonetheless, Plaintiff Park was informed that unless her placement manager approved overtime pay, she was not eligible for overtime pay.  *Id.* at ¶ 105.

These allegations, as well as others contained in the SAC, sufficiently allege both minimum wage and overtime violations for the Trainees and Consultants.  Therefore, it cannot be said that the amendments are futile, cause prejudice to Defendant or are made in bad faith.

---

[10]  The SAC contains additional allegations setting forth with even further specificity Plaintiff's approximation of overtime hours worked.  *See* SAC ¶¶ 96-104.

## <u>CONCLUSION</u>

Based on the foregoing, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court reconsider the Order and Judgment of March 9, 2017 and reinstate the dismissed claims or, in the alternative, vacate and/or amend its Order to allow Plaintiff an opportunity to amend her complaint.

Dated:  April 6, 2017
         New York, New York

                              Respectfully submitted,


                       By:      /s/_____

                              Christopher Q. Davis (CD-7282)
                              Rachel M. Haskell (RH-8248)
                              **The Law Office of Christopher Q. Davis**
                              225 Broadway, Suite 1803
                              New York, New York 10007
                              Telephone: (646) 430-7930

                              *Attorneys for Plaintiff and the Proposed*
                              *Collective Class*