**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

GRACE PARK, et al.,

                                 Plaintiffs,          16-CV-01520 (LTS)(SN)

          -against-                     **OPINION & ORDER**

FDM GROUP INC,

                                 Defendant.

-----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge:**

       Named Plaintiff Grace Park and the 14 Lead Plaintiffs (collectively, "Plaintiffs") move for conditional certification under the Fair Labor Standards Act ("FLSA"). For the reasons that follow, Plaintiffs' motion is GRANTED in part and DENIED in part.

## BACKGROUND[1]

       Plaintiffs are former employees of Defendant FDM Group, Inc. ("FDM"). Pls' Decls., ¶ 2. FDM provides information technology ("IT") staffing to individual client companies. Am. Gates Decl., ¶ 3. As of November 2018, FDM serviced more than 50 clients across the United States. Id.

       Plaintiffs began their employment in FDM's training program, the "FDM Academy." Pls' Decls., ¶¶ 2, 4. Each Plaintiff was placed in a "training stream," which corresponds to a specific content area within the IT field. Park Decl., ¶ 15; Bell Decl., ¶ 6; Shirvani Decl., ¶ 21; Suarez Decl.,

---

[1] Five Plaintiffs filed declarations in support of collective certification. See ECF No. 81-13, Declaration of Grace Park ("Park Decl."); 81-14, Declaration of Oronde Bell ("Bell Decl."); 81-15, Declaration of Ramin Shirvani ("Shirvani Decl."); 81-16, Declaration of Robert Suarez ("Suarez Decl."); 81-17, Declaration of Victor Quiroz ("Quiroz Decl.") (collectively, "Pls' Decls."). In addition, Paul Gates, the Vice President of North America for FDM, submitted a declaration in response to Plaintiff's initial motion for certification, as well as an amended declaration in response to the instant motion. See ECF No. 35-1, Declaration of Paul Gates ("Gates Decl."); ECF No. 93-1, Amended Declaration of Paul Gates ("Am. Gates Decl.").

¶ 5; Quiroz Decl., ¶ 6. FDM's training streams include: Data and Operational Analysis; Project Management; Application Support; Java Developer; Information Security; and Business Analysis, Testing, and Development. Am. Gates Decl., ¶ 5. After they completed their training, Plaintiffs were matched with one of FDM's clients. Park Decl., ¶ 19; Bell Decl., ¶ 9; Shirvani Decl., ¶ 23; Suarez Decl., ¶ 9; Quiroz Decl., ¶ 9. At that point, Plaintiffs signed an employment agreement and were deemed "FDM Consultants." Am. Gates Decl., ¶ 5.

Plaintiffs claim — and Defendant seems to admit — that all FDM Consultants were paid according to a hybrid compensation system. ECF No. 82, Plaintiffs' Brief ("Pls' Br."), at 5–6. As evidence, Plaintiffs submitted declarations from five Consultants, four of whom worked at different client sites. See Park Decl., ¶ 21 (Bank of America); Bell Decl., ¶¶ 13–14 (UBS, CitiGroup); Shirvani Decl., ¶ 25 (CitiGroup); Suarez Decl., ¶ 21 (BNP Paribas); Quiroz Decl., ¶ 13 (Bank of America). Each Consultant stated that he or she received: (1) a basic salary of $23,000 per annum; and (2) a daily bonus, consisting of $44 if the Consultant worked between four and eight hours at a client site, and $88 dollars if the Consultant worked eight hours or more.[2] Park Decl., ¶ 27; Bell Decl., ¶¶ 24, 28; Shirvani Decl., ¶¶ 33–34; Suarez Decl., ¶¶ 17, 19; Quiroz Decl., ¶¶ 23, 26. The Consultants also named other individuals at their respective placements who confirmed that they too were paid in this manner. Park Decl., ¶ 29; Bell Decl., ¶ 29; Suarez Decl., ¶ 20; Quiroz Decl., ¶ 27.

These claims are supported by FDM's corporate documents. For example, Plaintiffs produced FDM's U.S. Staff Handbook (the "Handbook"), which applies to all Consultants working at a client site. ECF No. 81-1, at 4. The Handbook states that Consultants received a monthly salary, as well as "daily bonus payments" for "billable days authorized by a client." Id. at 10. Similarly, Plaintiffs also produced employment agreements for Plaintiffs Grace Park and Robert Suarez. ECF

---

[2] During their second year of employment, Consultants' basic salary increased to $25,000 per annum, and their daily bonuses increased to $104 per full day and $52 per half day.

Nos. 81-2, 81-4. The agreements contain identical provisions, suggesting that Consultants, regardless of placement, agreed to the same terms and conditions. Moreover, the "Schedule 1" attachment to Suarez's agreement outlines the same compensation system as described in Plaintiffs' declarations — i.e., an annual salary, supplemented by a daily bonus depending on the number of hours worked for a client. ECF No. 81-2. For its part, Defendant admits that Consultants received "an annual base salary," plus "additional compensation" for "time spent at a client." ECF No. 92, Defendant's Brief ("Def's Br."), at 6. It contends, however, that Consultants who entered the FDM Academy after November 2014 received an annual salary of $23,750 (rather than $23,000). Gates Decl., ¶ 10.

Two other aspects of Plaintiffs' compensation are worth noting. First, under their employment agreement, Consultants agreed to work for FDM for a minimum of two years. ECF Nos. 81-2 & 81-4 at § 2.2. If, within the two-year period, a Consultant voluntarily left or was terminated for cause, he or she was required to pay a "Termination Fee." Id. at §§ 4.1–4.3. The Termination Fee — described by the agreement as a liquidated damages provision — is $30,000 during the first year of the agreement, and $20,000 during the second. Id. at § 1; see also Def's Br., at 7–8 (describing the Termination Fee). In her declaration, Plaintiff Grace Park asserts that she was required to pay the Termination Fee when she left FDM. Park Decl., ¶¶ 40–42. She also states that, based on her personal knowledge, FDM sought repayment from at least three other individuals. Id. at ¶ 43. The remaining Plaintiffs, however, did not pay the Termination Fee: most completed their employment term, and those that left early were not required to pay the fee. Am. Gates Decl., ¶¶ 15–17.

The second point concerns FDM's overtime policy. In October 2015, FDM distributed a "Mountie Schedule" to all new and existing Consultants. ECF No. 81-7. The Mountie Schedule provided, in part:

> Unless FDM is able to agree an additional fee with the client, you will not receive any additional payments for hours worked beyond the standard hours on any day. This includes occasions where the client specifically requests that you remain at work later to carry out further work.

Id. The Handbook similarly provides:

> Overtime working will not usually attract either additional payment or time off in lieu, unless it has been previously agreed in writing with your AccuManager or with the Client as part of your placement.

ECF No. 81-1, at 11. Accordingly, a Consultant's overtime compensation was determined by the staffing contract between FDM and the client with whom the Consultant worked. Def's Br., at 7. For example, none of the Plaintiffs who submitted declarations received additional compensation when they worked more than 40 hours in a week. Park Decl., ¶ 30; Bell Decl., ¶ 31; Shirvani Decl., ¶ 42; Suarez Decl., ¶ 24; Quiroz Decl., ¶ 28. Nevertheless, Travis Scavone, an FDM Consultant and non-party to this litigation, stated that he received $11 per hour for hours worked over 45 in a week. ECF No. 35-2, Declaration of Travis Scavone ("Scavone Decl."), ¶¶ 5, 10. Similarly, in a previous motion, Plaintiff Louis Caponi stated that he has never worked overtime as an FDM Consultant. ECF No. 35-3, Declaration of Louis Caponi ("Caponi Decl."), ¶¶ 7–8.

## LEGAL STANDARD

Section 216(b) of the FLSA provides that a plaintiff may proceed on behalf of himself and "other employees similarly situated." Hernandez v. City of New York, No. 16-CV-3445 (RA), 2017 WL 2829816, at *3 (S.D.N.Y. June 29, 2017) (quoting 29 U.S.C. § 216(b)). In appropriate cases, district courts may implement this provision by "facilitating notice to potential plaintiffs of the

pendency of the action." Myers v. Hertz Corp., 624 F.3d 537, 554 (2d Cir. 2010). Orders authorizing notice are often referred to as orders "certifying" a collective action. Guillen v. Marshalls of MA, Inc., 750 F. Supp. 2d 469, 475 (S.D.N.Y. 2010). Certification, however, is somewhat of a term of art: rather than creating a class of plaintiffs for a collective action, it serves as a "case management tool" to facilitate notice to potential class members. Myers, 624 F.3d at 555 n.10.

Courts conduct a two-step analysis when determining whether to certify a collective action. The first step — at issue in this motion — requires a "modest factual showing" that the putative class members were "victims of a common policy or plan that violated the law." Korenblum v. Citigroup, Inc., 195 F. Supp. 3d 475, 479 (S.D.N.Y. 2016) (citing Myers, 624 F.3d at 555). The plaintiff's burden at this stage is necessarily a "low standard of proof." McGlone v. Contract Callers, Inc., 867 F. Supp. 2d 438, 443 (S.D.N.Y. 2012) (citations omitted). Indeed, "it is widely recognized that the standard for conditional collective action certification is not a stringent one." Benavides v. Serenity Spa NY, Inc., 166 F. Supp. 3d 474, 478 (S.D.N.Y. 2016) (quoting Feng v. Hampshire Times, No. 14-CV-7102 (SHS) (JLC), 2015 WL 1061973, at *2 (S.D.N.Y. Mar. 11, 2015)).

The focus of the inquiry "is not on whether there has been an actual violation of the law," but rather on "whether the proposed plaintiffs are similarly situated with respect to their allegations that the law has been violated." Garcia v. Spectrum of Creations Inc., 102 F. Supp. 3d 541, 547 (S.D.N.Y. 2015) (citing Young v. Cooper Cameron Corp., 229 F.R.D. 50, 54 (S.D.N.Y. 2005). As a result, courts do not "resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." Diaz v. New York Paving Inc., 340 F. Supp. 3d 372, 382 (S.D.N.Y. 2018) (citing Lynch v. United Servs. Auto Ass'n, 491 F. Supp. 2d 357, 368 (S.D.N.Y.

5

2007)); Hamadou v. Hess Corp., 915 F. Supp. 2d 651, 662 (S.D.N.Y. 2013) ("In ascertaining whether potential opt-in plaintiffs are similarly situated, courts should not weigh the merits of the underlying claims.").

To justify conditional certification, plaintiffs may adduce evidence through pleadings, affidavits, and declarations. Chhab v. Darden Restaurants, Inc., No. 11-CV-8345 (NRB), 2013 WL 5308004, at *9 (S.D.N.Y. Sept. 20, 2013) (internal citations omitted). Although plaintiffs face a low burden, they cannot rely on unsupported assertions or conclusory allegations. Sanchez v. JMP Ventures, L.L.C., No. 13-CV-7264 (KBF), 2014 WL 465542, at *1 (S.D.N.Y. Jan. 27, 2014). Thus, for employees in different job functions, courts often require "concrete facts evidencing a common scheme or plan of wage and hour violations." Mata v. Foodbridge LLC, No. 14-CV-8754 (ER), 2015 WL 3457293, at *3 (S.D.N.Y. June 1, 2015).

At the second stage, the trial court will, on a fuller record, determine whether the opt-in plaintiffs are in fact "similarly situated" to the named plaintiffs. Myers, 624 F.3d at 555. The action may be "de-certified" if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice. Id.

## DISCUSSION

Plaintiffs request that the Court conditionally certify a collective action comprised of "all FDM Consultants employed by Defendant." Pls' Br., at 3; ECF No. 81-11, Proposed Notice of Pendency ("Proposed Notice"), at 1–2. To support their request, Plaintiffs allege that Consultants, regardless of training stream or client placement, were victims of five common policies that violated the FLSA. Specifically, Plaintiffs argue that: (1) the basic salary, for at least part of the collective, fell below the minimum statutory threshold; (2) the daily bonuses — because they were awarded for hours worked during the normal workweek — violated the salary-basis test; (3) the Termination Fee

created a significant likelihood of impermissible deductions; (4) FDM's overtime policy was facially unlawful; and (5) Consultants performed non-exempt production work. Pls' Br., at 15–18. Because Plaintiffs have sufficiently alleged that members of the collective were victims of a common scheme—a compensation policy that would not entitle them to an exempt overtime status—the Court does not address Plaintiffs' alternative justifications at this time.

### I. Conditional Certification

Plaintiffs claim that FDM's daily bonuses violated the salary-basis test. Pls' Br., at 15–16. To be paid on a salary basis, an employee must receive a "predetermined amount constituting all or part of [his] compensation." 29 C.F.R. § 541.602(a). That amount must be guaranteed; it cannot be reduced because of "variations in the quality or quantity of the work performed." Id. In addition, subject to the provisions of 29 C.F.R. § 541.604 ("Section 604"), an exempt employee can also receive various forms of "additional compensation."

Section 604 contains two relevant subsections. Under subsection (a), a salaried employee may receive additional compensation if he is guaranteed "the minimum weekly-required amount paid on a salary basis." 29 C.F.R. § 541.604(a). In other words, the employee must be paid $455 per week, regardless of hours worked. See 29 C.F.R. §§ 541.600(a). Although broad on its face, the regulation contains examples that seem to narrow its scope:

> Thus . . . the exemption is not lost if an exempt employee who is guaranteed at least $913 each week paid on a salary basis also receives additional compensation based on hours worked **for work beyond the normal workweek.**

29 C.F.R. § 541.604(a) (emphasis added). Interpreting this provision, courts have consistently allowed salaried employees to receive additional compensation, paid on an hourly basis, for hours worked *beyond 40 in a workweek*. See, e.g., Rivera v. Anjost Corp, 645 F. App'x 30, 31 (2d Cir. Apr. 1, 2016); Richardson v. Regeis Care Center, LLC,, No. 16-CV-3538 (LGS), 2017 WL 432806,

7

at *3 (S.D.N.Y. Jan. 30, 2017); Clarke v. JPMorgan Chase Bank, N.A., No. 08-CV-2400 (CM) (DCF), 2010 WL 139778, at *21 (S.D.N.Y. Mar. 26, 2010).

Similarly, subsection (b) provides another avenue for an employer to provide additional compensation to salaried employees. Under that provision, an exempt employee's earnings can be computed on an hourly, daily, or shift basis if two conditions are met. 29 C.F.R. § 541.604(b). First, the employee must be guaranteed at least $455 per week on a salary basis; and second, there must be a reasonable relationship between the employee's weekly guarantee and the employee's usual weekly earnings. Id. Such a relationship exists when the two amounts are "roughly equivalent." Id.

Here, Plaintiffs contend that FDM's daily bonuses violated both subsections. Regarding subsection (a), Plaintiffs emphasize that they receive $44 if they work between four and eight hours at a client site, and $88 if they work eight hours or more. As a result, Plaintiffs argue, the daily bonuses constitute additional compensation for *regularly scheduled hours*, not hours worked "beyond the normal workweek," as required by the regulation. See 29 C.F.R. § 541.604(a). Similarly, regarding subsection (b), Plaintiffs assert that their "usual earnings" for a normally scheduled workweek are approximately $896. Because they were guaranteed only $456 in weekly salary, Plaintiffs conclude that FDM's compensation structure violates the reasonable relationship test — i.e., that Plaintiffs' weekly guarantee is not "roughly equivalent" to their usual weekly earnings. See id. at § 541.604(b).

Plaintiffs have made a modest factual showing that they are similarly situated to other FDM Consultants with respect to these allegations. This is because the evidence suggests that all Consultants, regardless of training stream or client placement, received the same allegedly unlawful daily bonus. See Benavides, 166 F. Supp. 3d at 483 ("[C]ourts in this Circuit routinely find employees similarly situated despite not occupying the same positions or performing the same job

8


functions and in the same locations, provided that they are subject to a common unlawful policy or practice.").

Plaintiffs submitted declarations from five Consultants. Despite working at four different client sites, each Consultant stated that he or she was paid according to the same compensation scheme, which included the daily bonus. Park Decl., ¶ 27; Bell Decl., ¶¶ 24, 28; Shirvani Decl., ¶¶ 33–34; Suarez Decl., ¶¶ 17, 19; Quiroz Decl., ¶¶ 23, 26. Other individuals, identified by name in Plaintiffs' declarations, told Plaintiffs that they were paid in the same manner. Park Decl., ¶ 29; Bell Decl., ¶ 29; Suarez Decl., ¶ 20; Quiroz Decl., ¶ 27.

In addition, Plaintiffs' declarations are supported by FDM's corporate documents. The FDM Handbook — which applies to all Consultants — provides that Consultants receive "daily bonus payments" for "billable days authorized by a client." ECF No. 81-1, at 10. This is compelling evidence that Consultants, regardless of placement, received the daily bonus. See Knox v. John Varvatos Enter. Inc., 282 F. Supp. 3d 644, 654–55 (S.D.N.Y. 2017). Similarly, despite working for different clients, Consultants seem to sign a template employment agreement with FDM. See ECF Nos. 81-2, 81-4. That agreement lays out the same compensation structure as described in Plaintiffs' declarations, including the daily bonus. Finally, Defendant admits that all Consultants received "additional compensation" for "time spent at a client." Def's Br., at 6; Gates Decl., ¶ 10 ("[T]he compensation structure . . . includes a base pay and bonuses.").[3] Given Plaintiffs' low burden, this evidence is sufficient to warrant conditional certification. See Hamadou, 915 F. Supp. 2d at 661 ("[I]f defendants admit that the actions challenged by plaintiffs reflect a company-wide policy, it

---

[3] Defendant asserts that Plaintiff Louis Caponi "attested to receiving a first-year salary of $43,000 in 2015." Def's Br., at 6–7. This mischaracterizes Caponi's declaration. Although Caponi stated that he received approximately $44,000 during his first year as a Consultant, he clarified that his approximation included "the daily bonuses [he] receive[d] for working 8 hours per day at a client site." Caponi Decl., ¶ 9.

may be appropriate to find plaintiffs similarly situated based solely on plaintiffs' substantial allegations, without the need for additional evidence.").

Defendant's arguments to the contrary are unavailing. Defendant opposes conditional certification on two primary grounds: first, the daily bonuses are permissible under Section 604(a); and second, Section 604(b) is inapplicable because Consultants are not paid on an hourly, daily, or shift basis. Def's Br., at 17–18. These claims address whether the daily bonus was legal, not whether Plaintiffs are similarly situated to Consultants at other client sites. Accordingly, as merits arguments, they cannot be used to challenge conditional certification. Hamadou, 915 F. Supp. 2d at 662; Diaz, 340 F. Supp. 3d at 382. In any event, Plaintiffs' theory of liability is supported by relevant caselaw. See Rindfleisch v. Gentive Health Servs., Inc., 962 F. Supp. 2d 1310, 1322 (N.D. Ga. 2013) (concluding that, under Section 604(a), additional compensation can be awarded "[only] for work outside of an employee's normal week"); cf. Anani v. CVS RX Servs., Inc., 788 F. Supp. 2d 55, 66–68 (E.D.N.Y. 2011) (finding that employees were not paid on an hourly basis under Section 604(b) because their compensation was "for hours worked in excess of forty per week").

Defendant also claims that determining whether the daily bonuses violated the FLSA will require individualized proof. Def's Br., at 19. Although Defendant is correct that Section 604(b) requires an employee-specific analysis, see DOL Wage & Hour Division Opinion Letter, 2018 WL 5921453, at *2 (Nov. 8, 2018), conditional certification cannot be defeated "by arguing that individual issues may dominate." Francis v. A&E Stores, Inc., No. 06-CV-1638 (CS) (GAY), 2008 WL 4619858, at *3 (S.D.N.Y. Oct. 16, 2008) (citations omitted). The Court will evaluate at the decertification stage whether the need for individual analysis makes a collective action inappropriate. See id. at *3 n.3.

Finally, both parties assert that the Court should implement a three-year notice period. Def's Br., at 20; ECF No. 97, Plaintiffs' Reply Brief ("Pls' Reply Br."), at 10 n.3. That said, the parties do not address whether the notice period should be measured (1) from the date of the notice; or (2) from the date of the complaint. See 29 U.S.C. § 256(b); Compare Knox, 282 F. Supp. 3d at 661–63 (using the former) with Jinquan Yin v. Pomodoro Italian Express Inc., No. 17-CV-10244 (AJN), 2019 WL 1369469, at *3 (S.D.N.Y. Mar. 11, 2019) (using the latter). In differentiating these approaches, the Court must decide "under what conditions should notice be sent to employees whose employment ended before the start of the three-year limitations period." Knox, 282 F. Supp. 3d at 661. The Court agrees with the reasoning in Knox: absent a "realistic possibility" that opt-in plaintiffs will be able to demonstrate equitable tolling, the notice period should be tied to the date of the notice. Id. at 663. This excludes from the notice period any employees with "obviously time-barred claims and no explanation as to why they may be able to demonstrate equitable tolling in the future." Id. at 662.

The situation here is somewhat unusual. Generally, a litigant seeking equitable tolling must establish, among other things, that he pursued his rights diligently. Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005). Plaintiffs have not presented any evidence regarding the diligence of the putative collective members. Thus, under normal circumstances, the Court would measure the notice period from the date of the notice. See Knox, 282 F. Supp. 3d at 658, 663.

In this case, however, there is reason to avoid that outcome. The parties consented to tolling the statute of limitations for potential opt-in plaintiffs from April 29, 2016, until 30 days after the resolution of Defendant's motion to dismiss the amended complaint i.e., September 27, 2018. See ECF Nos. 15, 19, 78. As a result, measuring the notice period from the date of the notice would mean that Consultants *with timely claims* would not be informed of the collective action. This

contravenes the FLSA's broad remedial purpose. Accordingly, the Court will add to the notice period the length of time the parties agreed to toll the statute of limitations, which is 881 days. The Court therefore orders that the notice be sent to all Consultants who were last employed by FDM within three years plus 881 days (or 1,976 total days) from the date the notices are mailed.

## II.     Content and Procedures Regarding the Court-Authorized Notice

The parties raise various disputes regarding Plaintiffs' Proposed Notice. The Court addresses these issues in turn.

### A.     Distribution of the Notice

Plaintiffs seek permission to distribute the notice by first-class mail, email, and text message. Pls' Br., at 21. Plaintiffs also request that Defendant be required to post a copy of the notice in its offices in New York City. Id. at 22. Defendant opposes these requests, arguing that first-class mail is sufficient to inform potential opt-ins of the collective action. Def's Br., at 22. Although email distribution is appropriate, Plaintiffs are not permitted to distribute the notice via text message or workplace posting.

Some courts have expressed concern with dissemination by email. These courts reason that, in electronic form, the notice could be modified or more broadly circulated than the parties' intended. See Sharma v. Burberry LTD, 52 F. Supp. 3d 443, 463 (E.D.N.Y. 2014) (citing Karvaly v. eBay, Inc., 245 F.R.D. 71, 91 (E.D.N.Y. 2007)). "Nevertheless, 'given the reality of communications today,' email notification is more effective at notifying potential opt-in plaintiffs than mailed notice alone." Knox, 282 F. Supp. 3d at 667 (quoting Pippins v. KPMG LLP, No. 11-CV-0377 (CM) (JLC), 2012 WL 19379, at *14 (S.D.N.Y. Jan. 3, 2012)). For this reason, courts in this District routinely allow notice and consent forms to be distributed by email. Lloyd v. J.P. Morgan Chase & Co., No. 11-CV-9305 (LTS), 2013 WL 4828588, at *6 (S.D.N.Y. Sept. 9, 2013);

Martin v. Sprint/United Mgmt. Co., 15-CV-5237 (PAE), 2016 WL 30334, at *19 (S.D.N.Y. Jan. 4, 2016); Hernandez, 2017 WL 2829816, at *9. Plaintiffs are therefore authorized to do so here.

In contrast, Plaintiffs may not distribute the notice via text message. Generally, courts allow such dissemination where "the nature of the employer's business facilitated a high turnover rate among employees." Kucher v. Domino's Pizza, Inc., No. 16-CV-2492 (AJN), 2017 WL 2987216, at *6 (S.D.N.Y. May 22, 2017) (citing Martin, 2016 WL 30334, at *19). Although Consultants initially sign a two-year employment agreement, they do not necessarily stop working at the end of the period. See ECF No. 81-10, at 12 ("Consultants are under permanent contracts by their 2 year anniversary . . . . The Employment Contract does NOT automatically cease at 2 years."). Indeed, Plaintiffs provide no evidence about Defendant's turnover rate, arguing instead that "[c]ell phones are by far the most accessible communication tool for many workers." Pls' Br., at 21. Accordingly, without more information regarding the Consultants' typical length of employment, the Court will not authorize distribution via text message. See, e.g., Hotaranu v. Star Nissan Inc., No. 16-CV-5320 (KAM) (RML), 2017 WL 1390808, at *6 (E.D.N.Y. Apr. 12, 2017) ("As plaintiffs make no argument that there is a high turnover rate among automobile sales representatives, the court authorizes distribution of the notice via email and first-class mail, but not via text message.").

Similarly, Defendant is not required to post the notice in its offices in New York City. Courts are split on whether workplace posting is appropriate. Compare Guo Qing Wang v. H.B. Rest. Grp., Inc., No. 14-CV-813 (CM), 2014 WL 5055813, at *6 (S.D.N.Y. Oct. 7, 2014) ("Courts routinely approve requests to post notice on employee bulletin boards and in other common areas, even where potential members will also be notified by mail.") with Michael v. Bloomberg L.P., No. 14-CV-2657 (TPG), 2015 WL 1810157, at *4 (S.D.N.Y. Apr. 17, 2015) ("[A]bsent a showing that a significant number of notices were returned as undeliverable, courts have refused to require posting

13

of a collective action notice in the workplace."). Here, because Consultants generally do not work from Defendant's offices, posting the notice is unlikely to be effective. For this reason, and given the potential for disruption, the Court finds that workplace posting is unnecessary.

### B.     Reminder Postcard

Plaintiffs request permission to send a reminder postcard to potential opt-in plaintiffs at some point during the opt-in period. Pls' Br., at 22–23. Defendant objects, arguing that a reminder notice "could be interpreted as encouragement by the court to join the lawsuit." Def's Br., at 23. The case that Defendant relies on, however, was decided as a matter of first impression. See Guzelgurgenli v. Prime Time Specials Inc., 883 F. Supp. 2d 340, 357 (E.D.N.Y. 2012) ("[T]he Court has been unable to find[] any caselaw in the Second Circuit directly addressing a reminder notice."). Since then, courts in this District have regularly permitted reminder cards to be issued. See Diaz, 340 F. Supp. at 387 (citing Racey v. Jay-Jay Cabaret, Inc., No. 15-CV-8228 (KPF), 2016 WL 3020933, at *11 (S.D.N.Y. May 23, 2016) (collecting cases)). As one court reasoned, a reminder is appropriate because "notice under the FLSA is intended to inform as many potential plaintiffs as possible of the collective action and their right to opt in." Chhab, 2013 WL 5308004, at *16. Accordingly, Plaintiffs are permitted to send a reminder postcard during the opt-in period.

### C.     Discovery of Contact Information

Courts commonly grant requests to produce "names, mailing addresses, email addresses, telephone numbers, and dates of employment." Johnson v. Carlo Lizza & Sons Paving, Inc., 160 F. Supp. 3d 605, 612 (S.D.N.Y. 2016) (citing Martin, 2016 WL 30334, at *19). Accordingly, this information must be produced.

Nevertheless, Defendant is not required to produce its employees' social security numbers. Given privacy concerns, this information should be produced only when the plaintiff has

demonstrated that names and contact information are insufficient to effectuate notice. Ramos v. PJJK Rest. Corp., No. 15-CV-5672 (PKC), 2016 WL 1106373, at *5 (S.D.N.Y. Mar. 10, 2016) (citing Whitehorn v. Wolfgang Steakhouse, Inc., 767 F. Supp. 2d 445, 448 (S.D.N.Y. 2011)). Plaintiffs have made no such showing, merely speculating that "numerous notices will be returned by the post office." Pls' Br., at 24. If dissemination through mail and email proves insufficient, Plaintiffs may make a renewed application to the Court. See Garcia, 102 F. Supp. 3d at 551; Delaney v. Geisha NYC, LLC, 261 F.R.D. 55, 60 (S.D.N.Y. 2009) ("If Plaintiffs find that a large number of notices are returned as undeliverable, the Court can consider [a request for disclosure of social security numbers] at that time.").

### D. Content of the Notice

Defendant objects to the content of the Proposed Notice on six grounds. The parties are directed to meet and confer regarding these issues. To facilitate this process, the Court provides the following guidance:

1. The notice should inform potential opt-ins that they may be required to appear for a deposition and/or testify in court. See Sarikaputar v. Veratip Corp., No. 17-CV-00814 (ALC) (SDA), 2018 WL 4109348, at *7 (S.D.N.Y. Aug. 29, 2018); She Jian Guo v. Tommy's Sushi Inc., No. 14-CV-3946 (PAE), 2014 WL 5314822, at *5 (S.D.N.Y. Oct. 16, 2014).

2. The Proposed Notice adequately describes the payment of attorneys' fees.

3. The Proposed Notice adequately informs potential opt-ins that they may obtain their own attorney at their own expense.

4. Because the Proposed Notice informs prospective plaintiffs that they may retain their own counsel, the Court will not require that consent forms be returned to the Clerk of the Court. See

Kucher, 2017 WL 2987216, at *3; Benavides, 166 F. Supp. 3d at 486; Martin, 2016 WL 30334, at *18.

### E.     Opt-In Period

Plaintiffs propose a ninety-day opt-in period in their Proposed Notice. ECF No. 81-11, at 2–3. The Court agrees with Defendant that a sixty-day opt-in period is more appropriate. See Def's Br., at 24. "[C]ourts in this Circuit routinely restrict the opt-in period to sixty days." Yap v. Mooncake Foods, Inc., 146 F. Supp. 3d 552, 556–57 (S.D.N.Y. 2015) (citing Fa Ting Wang v. Empire State Auto Corp., No. 14-CV-1491 (WFK), 2015 WL 4603117, at *11 (E.D.N.Y. July 29, 2015) (collecting cases)). Plaintiffs do not attempt to justify a departure from the standard rule. Accordingly, the Proposed Notice shall be modified to reflect a sixty-day opt-in period. See, e.g., Escano v. N&A Produce and Grocery Corp., No. 14-CV-4239 (PAC), 2015 WL 1069384, at *3 (S.D.N.Y. Mar. 11, 2015) (ordering a sixty-day period when the plaintiff "[did] not explain why a 90-day period is necessary"),

### F.     Equitable Tolling

Plaintiffs request that the Court toll the statute of limitations for potential opt-ins from October 12, 2018, the date of Plaintiffs' motion, until the date of the notice. Pls' Br., at 25. This request is denied. Generally, a litigant seeking equitable tolling must establish two elements: (1) that he has been pursuing his rights diligently; and (2) that some extraordinary circumstance stood in his way. Contrera v. Langer, 278 F. Supp. 3d 702, 723 (S.D.N.Y. 2017) (citing Pace, 544 U.S. at 418).

At a minimum, Plaintiffs cannot establish the first element. Plaintiffs have not presented any evidence regarding the diligence of the potential opt-ins in pursuing their claims. If anything, the present record cautions against equitable tolling. See Gates Decl., ¶ 2 (stating that workplace notices

have been posted in FDM's employee breakroom since at least 2011). Evidence that *Plaintiffs* may have acted diligently—or that the case involves extraordinary circumstances, such as delay in deciding Plaintiffs' motion—is insufficient given the lack of information regarding the diligence of the potential opt-ins. See Contrera, 278 F. Supp. 3d at 724–25. Plaintiffs' request is therefore denied. Nevertheless, Consultants who join the case after this Order may still petition the Court for equitable tolling.

## CONCLUSION

Plaintiffs' motion for conditional certification of a collective action under the FLSA is GRANTED in part and DENIED in part. The Court authorizes notice to be sent to all FDM Consultants employed by Defendant within three years plus 881 days of the date of the notice. The parties shall file a proposed notice no later than seven days from the date of this Order.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:    May 22, 2019
          New York, New York